# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THOMAS POWERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 03-CV-0670-MJR |
| | ) |
| MATT FREDRICKSON, | ) |
| SGT. TURNQUIST, | ) |
| CAPTAIN GOODWIN, | ) |
| C/O KIRKLIN, | ) |
| C/O ANDERSON and | ) |
| LT. BRADLEY, | ) |
| | ) |
| Defendants. | ) |

## ORDER FOLLOWING BENCH TRIAL

**REAGAN, District Judge:**

### I. Introduction and Procedural Overview

Thomas Powers is an inmate of Dixon Correctional Center ("Dixon") who formerly was incarcerated at Hill Correctional Facility ("Hill") and Pinckneyville Correctional Center ("Pinckneyville"). At all times relevant, the Illinois Department of Corrections ("the IDOC") served as Powers's custodian.

In September or October, 2002, while incarcerated at Hill, Powers filed a lawsuit, pursuant to 42 U.S.C. § 1983, against officers and staff members at Hill. ***Powers v. Snyder*, Case No. 02-1372 (C.D.Ill.)** ("the 1372 lawsuit"). Defendants in that action were Matthew Fredrickson, Randy Goodwin, Lois Mathes, Dr. Obasi, Mark Pierson and Lieutenant Smith. Powers alleges that the summonses were delivered to Defendants in that action on February 15, 2003. He further alleges that, immediately thereafter, Defendants in the instant action, Fredrickson, Turnquist, Goodwin,

1

Kirklin and Anderson began to retaliate against him for filing the 1372 lawsuit. Subsequently, according to Powers, upon his being transferred to Pinckneyville, Defendant Bradley also retaliated against him for filing that action. Powers alleges, *inter alia,* the following acts of retaliation: numerous cell shake downs, which left his legal material and cell in disarray; writing non-substance inmate disciplinary reports; single cuffing him when he was medically required to be placed in two handcuffs; forcing him to sign away all of his property; and denying him needed medical equipment.

On August 10, 2007, Magistrate Judge Donald G. Wilkerson certified the case ready for trial. On March 17, 2008, a two-day bench trial commenced. Opening statements were made, witnesses called, and testimony adduced. Pursuant to **FEDERAL RULE OF CIVIL PROCEDURE 52**, having carefully reviewed the documents in issue and considered the evidence presented at trial, the Court now **FINDS** and **CONCLUDES** as follows.

## II. Findings of Fact

1. Powers is an inmate incarcerated within the IDOC and is currently housed at Dixon.

2. From July, 1997, through July, 1998, Powers was incarcerated at Hill. Defendants, Fredrickson, Goodwin, Turnquist and Anderson were employed at Hill during part or all of this time period. In July, 1998, Powers was transferred to Dixon Correctional Center. In August, 2002, Powers was transferred from Dixon back to the Hill facility. In May, 2003, Powers was transferred to Pinckneyville Correctional Center.

3. While incarcerated at Hill, Powers filed the 1372 lawsuit in the Central District of Illinois against, *inter alia*, Defendants Fredrickson, Goodwin, Mathes, Obasi, Pierson and Smith.

4. In February, 2003, Fredrickson worked as a commissary officer.

5. The date on which Fredrickson became aware of the 1372 lawsuit is disputed. The IDOC sent Fredrickson a Memorandum dated February 11, 2003, advising him of the lawsuit and requiring him to complete and return his response to Powers's allegations no later than February 21, 2003. Plaintiff's Exhibit 2. No evidence was presented at trial showing that Fredrickson actually received the Memorandum on any specific date. Moreover, the Memorandum required Fredrickson to complete and return the enclosed waiver of service of summons to IDOC "**immediately** upon receipt." Plaintiff's Exhibit 3 (emphasis in original). Fredrickson did not sign and return the waiver until February 24, 2003. Defendant's Exhibit 8. Given the immediacy of this requirement and the singularly small amount of effort required in signing and dating the waiver, the Court finds that Fredrickson was not notified of the 1372 lawsuit until approximately February 24, 2003. *See* Tr. 151:10-14 (Trial, Day 1, March 17, 2008) ("3/17/08").

6. Inmates' cells must be in compliance with institutional regulations, and cells must be maintained contraband-free. Compliance checks were a regular part of Fredrickson's duties, and, if he found contraband, it was his job to remove it. *Id*. 117:6-8; 120:25.

7. On February 18, 2003, while collecting commissary slips from the inmates, Fredrickson observed that Powers's cell was out of compliance, with an unauthorized headphone hanging from the light and a paper spear in plain sight. A paper spear is "hardened rolled up papers with a pencil point." *Id*. 118:23-24. A spear is about 36 inches long. Tr. 65:4-9 (Trial, Day 2, March 18, 2008) ("3/18/08").

8. A paper spear is considered contraband and is routinely confiscated. Id. 120:25, 154:10-12 (3/17/08). A spear is confiscated because an inmate can hide things, such as

drugs or knives, inside it and because it is not authorized. Tr. 65:20-21; 66:9-11 (3/18/08). Fredrickson confiscated Powers's spear because it was contraband, which Powers was not allowed to possess. Tr. 153:24-154:13 (3/17/08).

9. Fredrickson did not search Powers's cell but instructed Powers to bring his cell into compliance before leaving for commissary. *Id*. 121:5-22.

10. Fredrickson wrote Powers an Inmate Disciplinary Report ("IDR") for having contraband and turned the spear and the ticket in to the control unit. *Id*. 122:12-123:2. Processing the ticket and meting out any resulting discipline was not Fredrickson's responsibility. *Id*. 123:3-8. Powers received no discipline as a result of this incident. *Id*. 77:3-6.

11. IDOC rules prohibit inmates from displaying insolence towards officers by shouting at them. *Id*. 78:10-11.

12. Approximately two months after the original incident, on April 15, 2003, Fredrickson wrote Powers an IDR for insolence and damage to property. *Id*. 78:5-9. Powers had raised his voice to Fredrickson and had refused to allow a door to close that was supposed to lock. *Id*. 78:10-22. Fredrickson was found guilty on April 15, 2003, and lost commissary privileges for 14 days. *Id*. 78:25-26:2.

13. On April 16, 2003, Fredrickson wrote Powers an IDR for insolence for shouting at Fredrickson that the security door was closed. *Id*. 158:13-20. No discipline resulted from this IDR. *Id*. 33:10-21.

14. There is no evidence that Fredrickson discussed the 1372 lawsuit with other Defendants in this case and no evidence that he instructed other Defendants to retaliate against Powers.

4

15. Defendant Goodwin was a Correctional Captain at Hill in 2003 and was a shift commander on the 3:00-11:00 shift when the 1372 action was served. *Id*. 35:20-23.

16. Inmates' cells are routinely and randomly shaken down based on a sheet given to the count lieutenant by internal affairs rather than on order of the shift commander. *Id*. 193:12-16, 200:6-11 (3/17/08); 26:13-17 (3/18/08) . Inmates' cells must be shaken down at least once every 60 days. Tr. 26:4-6 (3/18/08).

17. Goodwin did not order shake downs of Powers's cell on February 18 or 19, 2003. *Id*. 14:4-13.

18. Inmates' cells are also shaken down when the presence of contraband is suspected. Correctional officers can conduct a security shake down without orders from the shift commander, but they report to him if they find any contraband. *Id*. 20:2-6.

19. About 4:00 P. M., on April 22, 2003, Powers returned a back brace to the healthcare unit. *Id*. 107:25-108:1; Defs' Exh. 7. Upon first examination, around 5:35 P. M., Nurse Miller[1] thought that two of four plastic staves were missing. *Id*. 108:9-14; Defs' Exh. 7. Because staves could easily be used as weapons, Nurse Miller contacted security. *Id*. 28:22-25; 108:10-19; Defs' Exh. 7.

20. Approximately 7:00 P. M. on April 22, 2003, Nurse Miller discovered that three staves were in one sleeve of the back brace and thus all staves were accounted for. Defs' Exh. 7. Nurse Miller and a correctional officer attempted to remove staves from a new back brace and were unable to do so because the staves are sewn in. *Id*. Nurse Miller wrote Powers an IDR for

---

[1]The Court will refer to the nurse by her current name, Miller. At the time of the incident, her name was Hackwith.

misuse/damage to property. *Id*. A correctional officer reported to Goodwin, approximately 8:00 P.M., that Powers's room had been shaken down and that nothing was found. *Id*.

21. Nurse Miller wrote Powers an IDR for the offense of damage to or misuse of property, describing the incident in which staves were removed from the back brace and replaced in the wrong sleeve. Defs.' Exh. 5.

22. Goodwin signed off on the IDR, indicating that the offense was a major infraction. *Id*. Powers's guilt or innocence of the infraction was determined by the Adjustment Committee and not by Goodwin. *Id*.

23. There is no evidence that Goodwin ordered any search of Powers's cell or took any other disciplinary action against Powers in retaliation for his filing the 1372 lawsuit.

24. Defendant Kirklin does not recall shaking down Powers's cell in the April 22, 2003, search for the missing staves. Tr. 195:18-23 (3/17/08).

25. A shakedown slip dated April 22, 2003, indicates a shakedown of Powers's cell. Pl's Exh. 46. However, it is unsigned. *Id*.[2]

26. Routinely, in a shake down for security reasons, Kirklin would rip open a pillow and a mattress if these had previously been opened. *Id*. 198:9-18. Sheets and pillowcases would be removed but left in the area for the inmate to make up his bed after the search. *Id*. 197:12-17. Kirklin would thoroughly search a cell but not deliberately make a mess. *Id*. 197:9-18.

27. Kirklin did not know about the previous lawsuit involving Goodwin and Fredrickson. *Id*. 198:15-17.

---

[2]The Court admitted the shakedown slip into evidence without objection and without the Court's considering the note at the top of the document, which was written by Powers himself. Tr. 95:19-20 (3/17/08).

28. Kirklin has never flushed a toilet to cause a cell to flood. *Id*. 197:1-5.

29. If there were an inch of water in a cell, it would not remain in the cell but would run out onto the wing and into at least one adjoining cell. Tr. 63:14-20 (3/18/08).

30. On May 5, 2003, Powers was placed under investigation by Tammy Bennett, an internal affairs officer, for his safety and for the security of the institution. Pl's Exh. 50; Pl's Exh. 23 , Bennett Dep. 6:7-9.

31. If an inmate makes a complaint that he is afraid of a correctional officer, it is standard procedure to put the inmate in segregation while his complaint is investigated. Bennett Dep. 25:14-18.

32. In May, 2003, an inmate could be placed in segregation for up to 30 days for investigative purposes. *Id*. 29:11-15.

33. When Tammy Bennett submitted Powers for a transfer, she followed the normal procedure for when an inmate claims that he is afraid for his safety because of staff misconduct. *Id*. 32:14-19; 33:20-34:1.

34. Powers wanted to be transferred immediately. Tr. 82:20-24 (3/17/08). He remained in segregation for approximately two-and-one-half weeks, which is a standard length of time to arrange a transfer. Bennett Dep. 47:21-48:8.

35. Powers was laterally transferred to Pinckneyville Correctional Center, a level two facility. *Id*. 40:9-12. The decision to transfer Powers to Pinckneyville was made by the transfer coordinator's office in Springfield. *Id*. 43:8-13. Powers wanted to remain in northern Illinois, but there were no level two facilities in northern Illinois other than Hill. *Id*. 41:8-11.

36. Defendants were not involved in the decisions to place Powers in investigative

status, to transfer him or to chose the facility to which he would be transferred.

37. During the relevant period, Defendant Turnquist was a sergeant assigned to the segregation unit. Tr. 164:1-7 (3/17/08).

38. During the relevant period, Defendant Anderson was a correctional officer working in the segregation unit under Turnquist. *Id*. 204:7-205:1.

39. Unless there is an order to the contrary, an inmate in segregation must be single cuffed behind his back for movement outside his cell. *Id*. 181:20-182:1; 169:8-14.

40. The policy of single cuffing an inmate is based on security concerns because a double-cuffed inmate could step through his cuffs and assault staff. *Id*. 182:10-13.

41. If an inmate claims that he has a shoulder injury, only the warden can direct double cuffing. *Id*. 183:3-5.

42. It is against regulations at Hill to single cuff an inmate in front. The normal procedure for moving an inmate with a medical problem that prevents his being single cuffed in back is to move the inmate in a waist chain. *Id*. 174:5-16.

43. Turnquist does not recall Powers's telling him that cuffing him behind the back was painful because of his shoulder injury. *Id*. 174:17-22.

44. Normally, medical authorization is required to double cuff an inmate. Pl's Exh. 24, Carothers Dep. 40:19-41:2.

45. After reviewing Powers's medical record, a nurse noted that there was "no complaint about his shoulder until June 9, 2003." Def's Exh. 1, medical records, June 24, 2003. Therefore, Powers did not have a medical staff determination or authorization that his shoulder condition necessitated double cuffing in May, 2003.

8

46. Lieutenant Carothers did not recall whether Powers showed him an X-ray report indicating a rotator cuff injury and did not recall whether he instructed Turnquist and Anderson to double cuff Powers. Carothers Dep. 42:3-13.

47. A nurse visits the segregation unit every day, but Carothers did not recall her telling him that Powers was to be cuffed in any manner other than the standard manner of cuffing. *Id*. 45:11-46:3.

48. The May 5, 2000, MRI of the right shoulder revealed "extensive intrasubstance degeneration with a small partial bursal surface tear and small intrasubstance tear with *no full thickness rotator cuff tear*." Pl's Exh. 3 (emphasis added).

49. Between May, 2001, and June 9, 2003, the medical record shows no complaint of shoulder pain by Powers. Therefore, during neither of his incarcerations at Hill (July, 1997, to July, 1998 and August, 2002, to May, 2003) did Powers complain to the medical unit of shoulder pain.

50. Turnquist and Anderson single cuffed Powers behind his back in accordance with standard procedure at Hill.

51. The medical record shows that, when Powers went to the medical unit on June 9, 2003, he requested an X-ray of his right shoulder because of a past rotator cuff injury. Defs' Exh. 1, medical records, June 9, 2003. He complained of pain lasting for two weeks. *Id*. The nurse noted that Powers had no edema or bruising and that he had a full range of motion in the shoulder. *Id*. Careful review of the medical records reveals that Powers referred only to "a past rotator cuff injury" and did not complain to medical staff about a more recent traumatic injury to the shoulder caused by single cuffing behind the back. *Id*.

52. Powers suffered no physical injury by being single cuffed by Turnquist and Anderson.

53. Turnquist and Anderson are not medical professionals and did not have access to Powers's medical records. Tr. 185:4-14 (3/17/08).

54. Turnquist did not shake down Powers's segregation cell but found the legal papers of Inmate Acosta in Powers's papers when Powers requested an exchange of legal materials from his excess property box. *Id*. 210:16-211:4.

55. IDOC rules prohibit one inmate from possessing another inmate's legal materials.

56. On May 7, 2003, Turnquist wrote an IDR on Powers for possessing Acosta's legal materials. Defs' Exh. 6.

57. Anderson was a witness to the May 7, 2003, IDR. *Id*.

58. Defendant Bradley was employed as a corrections lieutenant at Pinckneyville Correctional Center in May, 2003, when Powers was transferred there. Tr. 1:15-25 (3/18/08).

59. In May, 2003, Bradley was the supervisor of the Pinckneyville intelligence unit, with job duties that included investigating security threat group (gang) activity incidents. *Id.* 2:6-14.

60. The warden at Pinckneyville was Mark Pierson, who had been a Defendant in the 1372 lawsuit. *Id.* 2:18-19.

61. Bradley's job duties did not include inventorying the property of an inmate transferred to Pinckneyville. *Id.* 3:25-4:3.

62. Powers filed a grievance against Bradley, stating that Bradley and "acting

property officer Brown" went through his property and told him that he could only have his gym shorts and laundry powder. Pl's Exh. 73. The counselor's response was that "per Lt. Bradley," all property of which Powers complained had to be sent home or destroyed because the property was not in compliance with institutional regulations. *Id*.

63. Pierson did not tell Bradley that Powers filed a lawsuit against him and did not direct Bradley to take any action against Powers. *Id*. 6:7-15.

64. Powers has shown no nexus between union membership or other relationships among Defendants and the existence of a conspiracy against him.

### III. Conclusions of Law[3]

1. The filing of prisoner lawsuits is protected activity. ***Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002)**. It is well established that prison officials violate the Constitution when they retaliate against a prisoner for filing grievances or initiating lawsuits. ***Bounds v. Smith*, 430 U.S. 817, 821 (1977);** *Walker*, **288 F.3d at 1008-09**. Under the First Amendment, prisoners are entitled to file lawsuits, and prison officials may not restrict the exercise of this right except to the extent necessary for security or efficient administration. ***Buise v. Hudkins*, 584 F.2d 223, 231 (7th Cir. 1978)**. Retaliation for filing a lawsuit "offends the Constitution" because it inhibits individuals from exercising a protected right. ***Crawford-El v. Britton*, 523 U.S. 589 n. 10 (1998)**.

To establish a claim of retaliation for exercising free speech, an inmate must allege

---

[3]The Court will first address Powers's claims that are related to rules infractions and discipline. It will then turn to Powers's claims against Turnquist and Anderson regarding single cuffing and against Bradley for forcing him to sign away his property.

11

a chronology of events from which retaliation can be inferred, and prove both that his grievances were the motivating factor behind the defendants' conduct and that things would have transpired differently absent the retaliatory motive. *Hasan v. Department of Labor,* **400 F.3d 1001, 1005 (7th Cir.2005);** *Babcock v. White,* **102 F.3d 267, 275 (7th Cir. 1996)**. The prisoner may demonstrate improper motive by pointing to evidence suggesting a retaliatory motive, such as suspicious timing or statements by the defendant suggesting that he was bothered by the protected conduct. *Mullin v. Gettinger*, **450 F.3d 280, 285 (7th Cir. 2006);** *Culver v. Gorman & Co.*, **416 F.3d 540, 545-50 (7th Cir. 2005)**. However, suspicious timing is rarely enough to prove an unlawful motive without additional evidence. *Sauzek v.Exxon Coal USA, Inc.*, **202 F.3d 913, 918 (7th Cir. 2000) ("The mere fact that one event preceded another does nothing to prove that the first event caused the second.");** *see also Oest v. Illinois Dept. of Corr.*, **240 F.3d 605, 616 (7th Cir. 2001) (the inference of causation weakens as the time between the protected expression and the adverse action increases thus requiring additional proof of a causal nexus)**.

The prisoner has the burden of showing by a preponderance of the evidence that (1) he was engaged in activity protected by the First Amendment and (2) his activity was *one of the reasons - i. e.,* a motivating factor - for defendants' decision to take action against him. *Babcock v. White*, **102 F.3d 267, 275 (7th Cir. 1996) (citing** *Mt. Healthy City School District v. Doyle*, **429 U.S. 274, 287 (1977) ("T]he ultimate question is whether events would have transpired differently absent the retaliatory motive.")**. "A motivating factor is a factor that weighs in the defendant's decision to take the action complained of - in other words, it is a consideration present to his mind that favors, that pushes him toward, the action." *Hasan v. U.S. Dept. of Labor,* **400 F.3d 1001, 1006 (7th Cir. 2005) (citations omitted)**. If the prisoner can meet this standard, the

12

burden of persuasion will shift to the defendants to prove by a preponderance of the evidence that they would have taken the same action anyway. *Id*.

Powers meets the first prong of the test in that he alleges that he was engaged in in activity protected by the First Amendment - the filing of the 1372 lawsuit. However, he cannot meet the second prong of the test as to any Defendant.

Fredrickson had no knowledge of the 1372 lawsuit on February 18, 2003, when he confiscated Powers's paper spear. Fredrickson declared under oath that he was not aware of the lawsuit on February 18th, and his testimony is supported by the date on which he signed the waiver of service of summons (February 24th). Fredrickson's testimony is further buttressed by the fact that he was in the ordinary course of his commissary duties - rather than seeking Powers out - when he saw the spear, which was in plain sight. The spear is considered to be contraband, and it was Fredrickson's job to confiscate it as well as to direct Powers to bring his cell into compliance before proceeding to commissary and to write an IDR based on finding contraband. Because Fredrickson lacked prior knowledge of the lawsuit and because his actions were part of his duties, those actions cannot be considered to be retaliatory.

Fredrickson's writing IDRs based on Powers's other rule infractions was also done in the course of his duties and in accordance with IDOC rules. Under IDOC rules, an inmate cannot refuse to allow a security door to close and cannot yell at a correctional officer. A correctional officer cannot - because of a pending lawsuit or from fear that his actions will be considered retaliatory - look the other way when an inmate violates rules. Powers has failed to show that these events would not have transpired absent a retaliatory motive.

Powers also alleges that Kirklin, Turnquist, Anderson and Bradley retaliated against

13

him for filing the 1372 lawsuit. However, these Defendants testified under oath that they were not aware of the 1372 suit, and Powers has produced no evidence to the contrary. His suggestion that Defendants conspired to retaliate against him because they knew each other or were members of the same union lacks any substantiating evidence. Powers has failed to carry the burden of showing that Defendants' actions were retaliatory.

Powers's claims that Goodwin ordered cell shake downs in order to harass Powers and to retaliate against him is also without merit. The evidence shows that every cell is routinely and randomly searched every 60 days. Moreover, which cells are searched is dictated by the count lieutenant and by internal affairs, and not by the shift commander. The cell shake down for the missing staves resulted from Powers's returning the back brace to the medical unit in an altered form. Nurse Miller contacted security because she reasonably believed that two staves were missing from the brace and that those staves could be used as weapons. The IDR shows that Nurse Miller found that the staves were missing at 5:35 P. M. and immediately notified security. It was not until 7:00 P. M. that she discovered that there were three staves in one sleeve, which accounted for all the staves. Nurse Miller denied knowledge of the 1372 lawsuit under oath, and the likelihood that these events occurred to harass and retaliate against Powers defies belief. The Court finds that there is no evidence that the actions taken by Defendant Goodwin would not have transpired absent a retaliatory motive.

Powers claims that Turnquist retaliated against him by writing an IDR for possession of another inmate's legal materials. For Powers to possess another inmate's legal materials was against IDOC rules. When Turnquist found the materials, it was his job to remove them and to write Powers an IDR. Powers has failed to show that Turnquist's action was taken with a retaliatory

14

motive rather than as part of his job when he observed an infraction of the rules.

In sum, Powers's claims of retaliation fail because there is no evidence that Defendants' actions were taken in retaliation rather than as a result of Powers's own rule infractions - the possession of contraband, refusing to allow a security door to close, yelling at a correctional officer, damage to or misuse of property and possession of another inmate's legal materials. To hold otherwise would be to suggest that filing a lawsuit immunizes an inmate from discipline because he can claim that the discipline was in retaliation for filing the lawsuit.

2. It is well established that security is a legitimate goal of the penal system. ***O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987)**. Federal courts are ill equipped to deal with the problems of prison administration. ***Lewis v. Casey,* 518 U.S. 343, 387 (1996)**. "A deferential standard was deemed necessary to keep the courts out of the day-to-day business of prison administration, which 'would seriously hamper [prison officials'] ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration.'" ***Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)**. "The Court adopted a reasonableness standard, as opposed to a heightened scrutiny, to permit prison administrators 'to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration' and thereby prevent unnecessary federal court involvement in the administration of prisons." ***Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991) (quoting *Turner*, 482 U.S. at 89)**.

The standard, written procedure in the Hill segregation unit is to single cuff inmates behind their backs. Tr. 169:5-11 (3/17/08). An inmate could be given a double-cuffing permit if it was deemed medically necessary by the medical unit and if the warden signed off on the permit. It is clear from the record that Powers had no medical permit and had not been seen by a doctor for

15

his shoulder or complained of shoulder pain since May, 2001.[4] As Defendants explained, a double-cuffed inmate can step through the cuffs and assault staff. Thus, it is beyond question that single cuffing Powers behind his back - in the absence of a double-cuffing permit - was a reasonable response to a legitimate penological concern. There is no evidence that Turnquist and Anderson acted with a retaliatory motive; rather, they acted in accordance with standard procedure that served the goal of security. Accordingly, Powers's claims against Turnquist and Anderson fail.

Powers's claim against Defendant Bradley is even more attenuated than his other claims. Powers claims that Bradley forced him to sign away all of his property and denied him medically required low bunk permit, a walking cane and back brace to intimidate and punish him for pursing the 1372 action. *See* Amended Complaint, ¶ 11(g). Bradley testified under oath that he had no knowledge of the 1372 lawsuit. Tr. 6:7-15.

Powers has offered no chronology of events from which retaliation can be inferred and no evidence that retaliation was a motivating factor in Bradley's conduct. **Babcock v. White, 102 F.3d 267, 276 (7th Cir. 1996)**. As stated above, Powers's suggestion that Bradley conspired to retaliate against him because Defendants knew each other or were members of the same union is without evidentiary basis. This leaves only Powers's say-so, and his bare assertion is insufficient to carry the burden of showing that Bradley's actions, assuming any action were taken, were retaliatory. ***See, e. g., Riccardo v. Rausch*, 375 F.3d 521, 527-28 (7th Cir. 2004)**. A review of the

---

[4]The November 8, 2006, MRI of the right shoulder reveals more damage to the rotator cuff than appeared in the May 2, 2000 MRI, in that the 2006 MRI showed a full thickness tear as well as additional partial tears. *Cf.* Pl's Exhs. 3, 31. However, there is no contemporaneous evidence relating the shoulder damage to single cuffing, nor is there any medical evidence as to whether the cause was degenerative or traumatic and, if traumatic, if single cuffing would be sufficient trauma to create the tears.

facts reveals that Powers has not carried his burden of demonstrating that retaliation was a motivating factor behind Bradley's conduct. Accordingly, Powers's claim against Bradley must fail.

## IV. Conclusion

For all of the above reasons, on Plaintiff Thomas Powers's amended complaint (Doc. 59), the Clerk of Court shall enter judgment in favor of Defendants, Matthew Fredrickson, Ronald Turnquist, Edwin Anderson, Jason Bradley, Randy Goodwin and Brian Kirklin, and against Plaintiff, Thomas Powers. This case is closed.

**IT IS SO ORDERED.**

**DATED this 31st day of July, 2008**

**s/Michael J. Reagan**
**MICHAEL J. REAGAN**
**United States District Judge**
