**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **THOMAS POWERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 03-CV-0670-MJR** |
| | ) | |
| **MATT FREDRICKSON,** | ) | |
| **SGT. TURNQUIST,** | ) | |
| **CAPTAIN GOODWIN,** | ) | |
| **C/O KIRKLIN,** | ) | |
| **C/O ANDERSON and** | ) | |
| **LT. BRADLEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM AND ORDER**

**REAGAN, District Judge:**

**I. Introduction and Procedural Overview**

Thomas Powers is an inmate at Dixon Correction Center who formerly was
incarcerated at Hill Correctional Facility ("Hill") and Pinckneyville Correctional Center. At all
times relevant, the Illinois Department of Corrections ("the IDOC") served as Powers's custodian.

Powers sued several correctional officers and staff members at Hill in September or
October, 2002. ***Powers v. Snyder*, Case No. 02-1372 (C.D.Ill.)** ("the 1372 lawsuit"). Powers
alleges that immediately after summonses were served on the Defendants in the 1372 lawsuit,
Defendants herein began to retaliate against him for filing that action. Powers then filed the instant
lawsuit alleging acts of retaliation, which included numerous cell shakedowns, which left his legal
material and cell in disarray; writing non-substance inmate disciplinary reports ("IDRS"); single
cuffing him when he was medically required to be placed in two handcuffs; forcing him to sign away

all of his property; and denying him needed medical equipment.

Powers's lawsuit proceeded to bench trial, following which the Court entered judgment against Powers and for Defendants. Powers moves for a new trial or, in the alternative, to amend the judgment as to Defendants Fredrickson and Turnquist only, pursuant to Rules 59(a) and 52(b) of the Federal Rules of Civil Procedure and pursuant to Local Rule 7.1(c) (Doc. 174). Powers's motion qualifies under the Rules because it was filed on the tenth day after entry of judgment.[1] Powers believes that the Court made erroneous findings of fact which caused it to rule against Powers and in favor of Fredrickson and Turnquist. For this reason, Powers moves the Court to order a new trial against these two Defendants, amend its prior findings, make new findings or enter judgment in favor of Powers and against these Defendants.

"In ruling on a motion for new trial, federal law requires a district court to determine "whether 'the verdict is against the weight of the evidence ... the damages are excessive, or ... for other reasons, the trial was not fair to the party moving.'" ***Kapelanski v. Johnson,*** **390 F.3d 525, 530 (7th Cir. 2004) (citing *EEOC v. Century Broadcasting Corp*., 957 F.2d 1446, 1460 (7th Cir. 1992) (quoting *General Foam Fabricators, Inc. v. Tenneco Chems., Inc*., 695 F.2d 281, 288 (7th Cir.1982))**. Rule 52 (b) motions are intended to correct manifest errors of law or to present newly discovered evidence; they are not intended to relitigate old matters or to allow the parties to present new theories of the case. ***Collins v. United States,*** **2008 WL 95514, 2 (N.D.Ill. 2008) (citing *Mora v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996); *Russell v. Deico Remy Division of General***

---

[1] Rule 52(b) provides that "[o]n a party's motion filed no later than 10 days after entry of judgment, the court may amend its findings - or make additional findings - and may amend the judgment accordingly." **FED. R. CIV. P. 52(b)**. Similarly, Rule 59(e) provides that a motion to alter or amend judgment may be filed no later than 10 days after entry of judgment. **FED. R. CIV. P. 59(e)**.

*Motors Corp*., **51 F.3d 746, 749 (7th Cir. 1995) (additional citations omitted)**)).

"Motions made under Rule 52(b) ... are not intended merely to relitigate old matters nor are such motions intended to allow the parties to present the case under new theories.  Instead, [Rule 52(b)] motions are intended to correct manifest errors of law or fact or to present newly discovered evidence."  *MacSteel Intern. USA Corp. v. Superior Products Co., Inc*., **2002 WL 1067248, 1 (N.D.Ill. 2002) (citation omitted)**.

The Court has now reviewed Powers's motion and considered the arguments presented therein. Powers has not established that the verdict is against the weight of the evidence nor has he shown the existence of any manifest errors of law or fact in the Court's July 31, 2008, decision and order. Powers has not presented any newly discovered evidence as required by Rule 52(b). Accordingly, Powers's motion will be denied.

## II.    Analysis

### A.    Matthew Fredrickson

Powers argues that the Court erred in finding that no evidence was presented at trial that Fredrickson actually became aware of the lawsuit by February 18, 2003, and in finding that Fredrickson did not sign and return the waiver of service of summons until February 24th. Specifically, Powers contends that the Court failed to give consideration to Powers's emergency grievance filed with Warden Jaimet on February 18th and to the testimony of various inmates about Fredrickson's unprecedented shakedown of Powers's cell on that day.  Powers asserts that the only logical reason for Fredrickson's confrontations with Powers on February 20, April 15 and April 16, 2003 is retaliatory animus.

Defendants respond that Powers's characterization of Fredrickson's acts in the

February 18th grievance shed no light on whether Fredrickson was aware of the 1372 lawsuit. Defendants contend that rather than being motivated by retaliatory animus, Fredrickson had legitimate penological reasons for his actions towards Powers, specifically, that Powers violated IDOC rules by possessing contraband, displaying insolence to Fredrickson and keeping a security door from locking.

The Court will not disturb its findings as to Fredrickson. Powers has not shown by a preponderance of the evidence that Fredrickson was aware of the 1372 lawsuit prior to February 24, 2003. His claims of retaliatory animus do not square with the evidence presented. Powers did not deny that he had a paper spear in his cell in plain sight, that a paper spear is considered contraband and that Fredrickson was required to confiscate contraband upon observing it. Rather than seeking Powers out, Fredrickson was on his routine commissary rounds, which required him to go to each cell that had a commissary slip sticking out of the door or chuckhole. *See, e.g.,* Tr. 3/18/08, Sherwood testimony, 39:22-40:6. Fredrickson had other confrontations with Powers, but retaliatory animus is not "the only logical reason" for these confrontations. In each instance, a legitimate penological reason existed for Fredrickson's writing IDRs on Powers: insolence for yelling at a correctional officer, damage to property and refusing to allow a security door to close. Moreover, Fredrickson was not responsible for processing the disciplinary reports or meting out discipline.

Powers asserts that the testimony of the inmate fact witnesses attests to the extraordinary nature of Fredrickson's unprecedented shakedown of Powers's cell on February 18th. The Court has again reviewed the inmates' testimony and finds that it fails to shift the balance in Powers's favor. Inmate Christopher Lekes testified that during the period that he was at Hill -

4

slightly more than a year - he did not see Fredrickson enter a cell to search it or shake down a cell during commissary call. Tr. 33:4-12. Lekes also testified that he only knew what happened in his own wing. *Id*. 34:21-23. Inmate Ricky Bell testified that he had never seen Fredrickson shake down a cell or a do compliance check. *Id*. 80:23- 81:3. He also testified that he did not recognize Powers's name and had no idea what happened between Powers and Fredrickson. *Id*. 82:23-83:3. Inmate Sherwood testified that he had never seen Fredrickson enter a cell to search it or shake down a cell when he did commissary call. *Id*. 41:14-20. However, Sherwood was not housed in the same unit as Powers, did not know if Fredrickson had searched any cells in other units and had never observed an incident between Powers and Fredrickson. *Id*. 42:12-43:3. Inmate Marti testified that he had observed the "rough" shakedown of Powers's cell on April 22, 2003, by Fredrickson and three other officers, where the cell was left a "big mess" with water on the floor.[2] *Id*. 50:7-10; 52:18-53:7; 58:16-18. However, although Marti maintained that he could see directly into Powers's cell, he conceded that his cell was across the prison wing on the other side of a large, open central area. *Id*. 56:10-16; 59:20-22. Marti also testified that he had seen Fredrickson confiscate paper spears on his "regular walk through the whole wing, going cell to cell." *Id*. 57:19-58:8. Marti testified that he had never seen Fredrickson give inmates a hard time. *Id*. 54:24-55:4.

Although three of these witnesses had never seen Fredrickson shake down a cell, their factual knowledge cannot be considered to be comprehensive because they only knew what happened in their own wings of the facility. None of the inmates appears to have observed the

---

[2]The April 22nd shakedown occurred after Nurse Miller alerted security that two plastic staves - which could easily be used as weapons - were missing from a back brace returned to the healthcare unit by Powers. Approximately 7:00 p.m. on April 22nd, Nurse Miller discovered that all of the staves were accounted for.

February 18th shakedown, although Marti testified that he heard Fredrickson shouting at Powers in February, 2003. *Id.*, 49:13-17. Marti observed the April 22nd shakedown, but that shakedown can scarcely be considered to be retaliatory, given the report of the missing staves and the fact that three officers besides Fredrickson participated in the search. Moreover, Marti, the only inmate testifying who was housed on the same wing as Powers, stated that he had seen Fredrickson confiscate paper spears -which would require Fredrickson to look into and enter cells - on his regular walk through the wing. Although Powers asserts that Fredrickson had a "history of demonstrating a bad temper," none of the inmates testified to this. Bell had no idea what happened between Fredrickson and Powers; Sherwood had never observed an incident between them; and Marti had never seen Fredrickson giving inmates a hard time. In sum, the inmates' testimony does not help Powers prove that Fredrickson acted from an improper motive or that things would have transpired differently absent a retaliatory motive.

Having carefully considered Powers's arguments and after reviewing the July 31st decision and order, the Court finds that there is no basis to amend the July 31st order or to grant a new trial as to Fredrickson.

### B. Ronald Turnquist

Powers argues that the Court erred in finding that there was no evidence that Turnquist acted with a retaliatory motive rather than in accordance with standard procedure that served the goal of security. He contends that Fredrickson's retaliations against Powers led directly and quickly to Turnquist's deliberate and willful infliction of unnecessary physical pain upon Powers. According to Powers, Defendants misled this Court by submitting medical records that lacked information about Powers's 2001 rotator cuff injury, including medical notes detailing the

pain Powers suffered in his right shoulder. Powers asserts that he showed Turnquist his MRI, which revealed the damage to his shoulder, but Turnquist refused Powers's request to double-cuff him or to cuff him in front of his body. Powers contends that Defendants presented no evidence showing that he was in segregation for physical assault; consequently, there was no penological justification for inflicting unnecessary pain on him. Powers argues that Turnquist revealed retaliatory animus by willfully inflicting unnecessary and unjustified pain on him.

Defendants respond that there is no evidence that Turnquist was aware of the 1372 lawsuit and, for this reason, he could not have retaliated for it. According to Defendants, it follows then that Powers's arguments as to the severity of his shoulder injury are moot. Defendants contend that they submitted the medical records for the relevant time period, which show that no double cuffing permit was issued and that Powers had not complained of shoulder pain during the entirety of his incarceration at Hill. Defendants also assert that Powers had access to his medical records and could have put into evidence any records he chose. Finally, Defendants maintain that Turnquist had no access to Powers's medical records and no medical training.

The records submitted by Powers do not constitute newly discovered evidence. Powers had access to his medical records and was free to put them into evidence at trial. Moreover, the records Powers now submits show no plan for further examination or treatment and indicate no need for double-cuffing. On May 3, 2001, although the record is difficult to read, it appears that Powers received a routine, periodic examination in which a "right rotator cuff injury and residual [illegible]" are noted. Doc. 174, Exhibit 1. No treatment plan is indicated. *Id.* On May 30, 2001, Powers went on sick call where he complained of left hip pain, right shoulder pain, low back pain and difficulty urinating. Doc. 174, Exhibit 2. Again, no further examination, treatment or follow-up

care is indicated - and double-cuffing is not prescribed. *Id.*

If these records were "newly discovered evidence" and not available to Powers at the time of trial, they would cause the Court to alter one finding of fact. The Court found that between May, 2001 and June 9, 2003, the medical record revealed no complaint of shoulder pain by Powers. Finding of Fact 49. The record now before the Court clearly establishes two instances where Powers complained of right shoulder pain in May, 2001. However, neither a new trial nor an amendment to the Court's findings is appropriate or required in these circumstances. The records are not "newly discovered evidence," and the Court's finding does not constitute a manifest error. The timely production of this record would require the Court to find that "between *June*, 2001 and June 9, 2003, the medical record showed no complaint of shoulder pain by Powers." If error occurred, it did not affect Powers's substantial rights, did not affect the outcome of the proceedings and is, therefore, harmless.

As the Court found in its July 31st Order, the policy of single-cuffing an inmate is based on security concerns because a double-cuffed inmate could step through the cuffs and assault staff. Turnquist has neither the medical background nor the responsibility for reviewing an MRI to determine if a shoulder injury existed and required double-cuffing. Medical authorization is normally required to double-cuff an inmate and only the warden can direct double-cuffing. The medical records, including Powers's exhibits, contain no medical staff determination that his shoulder condition necessitated double-cuffing in May, 2003, and no authorization for double-cuffing.

Critically, too, Powers has failed to establish that Turnquist had a retaliatory motive for single-cuffing him. There is no clear nexus, no evidence, that retaliation for filing the 1372

lawsuit was a factor that motivated Turnquist's actions.

Having carefully considered Powers's arguments and after reviewing the July 31st decision and order, the Court finds that there is no basis to amend the July 31st order or to grant a new trial as to Turnquist.

### III.    Conclusion

In sum, the Court's findings against Powers and in favor of Defendants Fredrickson and Turnquist were not based on manifest errors of law or fact and were supported by the manifest weight of the evidence.  For these reasons, the Court **DENIES** Motion of Plaintiff Thomas Powers for New Trial, or in the Alternative, Motion to Amend the Judgment (Doc. 174).

**IT IS SO ORDERED.**

**DATED this 17th day of December, 2008**


**s/Michael J. Reagan**
**MICHAEL J. REAGAN**
**United States District Judge**